IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBERT FITRAKIS,

   Plaintiff,

v.

JON HUSTED, et al.,

   Defendants.

Case No. 2:12-cv-1015
JUDGE GREGORY L. FROST
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter is before the Court on Plaintiff Robert Fitrakis's motion for a temporary restraining order ("TRO"). (ECF No. 3.) Specifically, Fitrakis seeks an injunction prohibiting Defendant Ohio Secretary of State Jon Husted ("Secretary") from using certain software provided by Defendant Election Systems & Software, Inc. ("ES&S") "in order to record and tabulate votes cast by Ohio voters" in today's election. (*Id.* at 1.) Defendant Secretary and Defendant ES&S each filed a memorandum in opposition to Fitrakis's motion for a TRO. (ECF Nos. 9 and 10.) Pursuant to S. D. Local Rule 65.1, this Court convened a telephone conference with the parties' counsel on November 5, 2012. And on November 6, 2012, the Court convened a TRO hearing at which the parties presented testimony and affidavits and presented arguments for and against the relief requested by Fitrakis. The matter is now ripe for decision by the Court.

For the reasons set forth below, the Court **DENIES** Fitrakis's motion for a TRO.

### I. Background

Plaintiff Fitrakis is an Ohio resident and taxpayer, a co-Chairman of the Green Party of Ohio, and a candidate for Congress in Franklin County, Ohio, in the November 6, 2012 general election. (Compl. ¶ 5, ECF No. 1; Fitrakis Aff. ¶¶ 4-5, ECF No. 3-1.)  Fitrakis filed the

Complaint in this action on November 5, 2012.  (Compl., ECF No. 1.)  Fitrakis alleges that the Secretary entered into a contract with ES&S, pursuant to which ES&S provided "hardware and software" that the Secretary "will use to record and tabulate votes cast by Ohio voters in the General Election on November 6, 2012."  (*Id.* at ¶ 10.)  Fitrakis alleges that there is an "imminent risk" that persons will be able to "access the recording and tabulation of votes cast by Ohio voters" using the ES&S software that is the subject of this lawsuit.  (*Id.* at ¶ 11.)  Fitrakis contends that it is therefore possible that the use of the ES&S software will cause "irreparable harm" by making it possible for someone to alter the results of the election in the counties where the ES&S software is utilized.  (*Id.* at ¶ 12.)

For their part, Defendants dispute Fitrakis's characterization of the functionality of the software in question.  According to ES&S, the software in question—called an EXP utility—is a standalone software program whose function is merely to "assist the early reporting of the vote results by reformatting *already-tabulated and stored* election night results into a pre-defined file format for the Secretary."  (ES&S Memo. in Opp. 2, ECF No. 9.)  According to ES&S, the EXP software does not count votes and has no capability to "write" over or otherwise change election results stored in county computers tabulating the vote.  (*Id.* at 3.)  Likewise, the Secretary explains that the software's purpose is to allow a county board of elections to report its vote totals "through a secure upload process to the Secretary of State who then reports the statewide vote totals."  (Husted Memo. Contra 2-3, ECF No. 10.)  The software at issue, according to the Secretary, does not and cannot alter or tabulate votes.  (*Id.* at 3.)

Fitrakis alleges a claim under 42 U.S.C. § 1983, based on an alleged violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  (*Id.* at ¶¶ 13-16.)  He also asserts an Ohio taxpayer claim, challenging the Secretary's authority to

2

enter into the contract with ES&S and to use the software in question during the November 6, 2012 election.  (*Id.* ¶¶ 20-26.)

This Court convened a TRO hearing on the morning of November 6, 2012.  By agreement of the parties, Fitrakis presented by telephone the testimony Michael Duniho, a purported expert in computer security with experience in evaluating software issues related to election results tabulation, particularly in Pima County, Arizona.  Mr. Duniho testified that the software in question, called the "EXP" software, has the potential of making the county vote tabulation computers vulnerable to a virus or some other anomaly that could affect the official counting of the vote.  In Duniho's opinion, the state should have a system in place to "hand count" or otherwise audit the vote totals to assure the accuracy of the data collected by the EXP software and transmitted to the Secretary.

Fitrakis also submitted his own declaration as evidence in support of his motion for TRO.  Fitrakis's affidavit identified three articles co-authored by Fitrakis and published at FreePress.org; the articles reported on the ES&S software at issue in this litigation and generally questioned the software's impact upon the integrity of the election process.  Fitrakis also submitted a declaration from James March, a computer technology professional.  (ECF No. 3-5.)  March states that he has worked in the computer industry for seventeen years and recently began providing technical assistance regarding computer-based voting systems.  March currently sits on the Pima County Election Integrity Commission in Pima County, Arizona.  March also is a member of the board of directors for the ACLU's Southern Arizona Chapter and is a founding and current board member of an organization called http://blackboxvoting.org.

March has reviewed a copy of Contract # 2013–004 between the Ohio Secretary of State and ES&S describing the ES&S software at issue.  March believes that the ES&S software is not

3

necessary for the conduct of elections and is dangerous to the election process. March stated the ES&S reporting software would have "full contact with the central tabulator database on both a read and write basis" (ECF No. 3-5, at 4) and that, as a result, a case of accidental damage to the tabulated election data is possible. March further stated that the only means to double check the voting results after the ES&S reporting software has been utilized is to check the original paper and/or any remaining "poll tapes" from the precincts. March suggests that the State of Ohio should instead utilize a system in which tabulated vote counts are printed out and then inputted into another computer for reporting. March's declaration does *not* state that he has tested or otherwise reviewed the EXP software utility that is the subject of this lawsuit.

In opposition to the motion for TRO, Defendants submitted affidavit testimony that refuted Fitrakis's arguments and the testimony of Fitrakis's witnesses. ES&S submitted an affidavit from William Malone, a software systems analyst for ES&S. (ECF No. 9-1.) Malone states that he was involved in designing and preparing the ES&S Reporting Manager's Results Export Program ("EXP") that the Ohio Secretary of State purchased pursuant to Contract # 2013-004. Malone further states that EXP is a software program that is designed to supplement Ohio's vote tabulation software, Election Reporting Manager ("ERM").

Malone explained that while ERM is used to tabulate votes, EXP is *not* a vote-tabulation program. EXP reformats already-tabulated election night data into a new file format that is uniform across counties. EXP's access to the tabulated election data is "read-only"—it cannot edit or otherwise change the elector's choices—and EXP is designed to assist in the early reporting of vote results. Malone states that ES&S did not install a "back door" into its EXP program and that ES&S is not aware of any instance in which anyone has used or attempted to use EXP to alter a recorded vote.

4

The Secretary submitted an affidavit from Douglas Lumpkin, the Secretary's Chief Operating Officer and Chief Information Officer. (ECF No. 11-4.) Mr. Lumpkin described the process by which county boards of elections report election results to the Secretary of State. Those counties not using the EXP reporting software will tabulate their vote totals, sign into the Secretary's election night reporting system, and manually input vote totals for statewide candidates and issues. The counties using the EXP reporting system will process their vote totals in the same way but will not manually input the vote totals. Instead, these counties will use the EXP software to generate a file that assigns an identifying number to each statewide candidate and issue. The counties will then save the EXP output files to a "jump drive" (also known as a flash drive), transport the drive to a computer that is connected to the Secretary's election night reporting system, insert the jump drive into the computer, sign into the system and upload the EXP file. The counties will then review the results and transmit their vote totals to the Secretary. Mr. Lumpkin states that each county using the EXP reporting software has been supplied with twenty jump drives and will report their vote totals to the Secretary every fifteen minutes. Counties have been instructed to save each jump drive.

In addition to presenting Lumpkin's affidavit to show what the EXP software does as a matter of function, counsel for the Secretary explained during closing argument what the purpose of the software is. In election days past, counties traditionally reported vote totals to the Secretary by manually entering the data into a computer and then transmitting that data to the Secretary's Office. Instead of doing it that way, the counties with the EXP software may now put the "jump drive" into the county computer, obtain the data, and then plug the jump drive into the computer used for transmitting the information to the Secretary's Office. The EXP software formats the information regarding the statewide races in a manner that is more readily useable by

the Secretary. According to the Secretary's counsel, the EXP software allows the Secretary to obtain vote count results more quickly while eliminating the possibility of human error inherent in the old system.

## II.     Discussion

### A. Standard Involved

In considering whether injunctive relief is warranted, this Court must consider (1) whether Fitrakis has demonstrated a strong likelihood of success on the merits; (2) whether Fitrakis will suffer irreparable injury in the absence of equitable relief; (3) whether an injunction would cause substantial harm to others; and (4) whether the public interest is best served by granting an injunction. *Cooey v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (citing *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007) and *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). These factors " 'are not prerequisites that must be met, but are interrelated considerations that must be balanced together.' " *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

### B.     Likelihood of Success on the Merits

The likelihood of success on the merits factor weighs heavily against Fitrakis: simply put, he has demonstrated zero likelihood of success based on the evidence presented to this Court in the TRO motion and in the TRO hearing.

Fitrakis's first claim for relief alleges a Section 1983 claim. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

6

42 U.S.C. § 1983.  Thus, in order to prevail on his § 1983 claim, Fitrakis must show that, while acting under color of state law, Defendants deprived or will deprive him of a right secured by the Federal Constitution or laws of the United States.  *See Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003).  Here, Fitrakis hitches his horse to the Equal Protection and Due Process clauses of the United States Constitution.  (Compl. ¶¶ 14-15.)

Just a few weeks ago, the United States Court of Appeals for the Sixth Circuit reiterated the applicable standards for evaluating Equal Protection and Due Process challenges to state actions that allegedly impinge upon the fundamental right of voting.  *See generally Ne. Ohio Coalition for the Homeless v. Husted*, Nos. 12-3916 & 12-4069, 2012 U.S. App. LEXIS 21058, 2012 WL 4829033 (6th Cir. Oct. 11, 2012).  As to an equal protection challenge to a state action or regulation that burdens the right to vote, courts must weigh the character and magnitude of the alleged injury against the state's interest.  *Id.*, 2012 U.S. App. LEXIS at *11 and *30; *see also Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983); *Burdick v. Takushi,* 504 U.S. 428, 434 (1992).  In this case, Fitrakis fails to show the requisite burden upon his right to vote that would trigger an equal protection problem.

Fitrakis's alleged harm is purely speculative.  His Motion for TRO suggested as much, when he argued that the software "alters the whole system" of tabulating votes.  Though he made this bold statement, his argument turned the burden of proof on its head; instead of explaining to the Court *how* the system would be altered by the Secretary's use of the EXP software, Fitrakis instead argued that "[t]here is no objective proof that the new software will not adversely affect the existing software in an unforeseen way" and that "[t]here is no evidence that [unforeseen adverse software impact] will not happen here, other than the vendor's assurances in this case."  (Pl.'s Memo. in Support of TRO 3, ECF No. 3.)  The evidence presented at the hearing was not

any more enlightening. Mr. Duniho's testimony was entirely speculative, in that he admitted (1) that he had never tested the EXP software, (2) that he did not know whether EXP actually had an issue with a virus or a "back door," and (3) that he did not know whether the EXP software had ever "flipped a vote." In short, Duniho presented his opinion that a doomsday election-altering scenario *could* theoretically happen, but had no personal knowledge or experience to support the notion that there was an imminent harm that *the EXP software* was going to cause such a problem during the November 6, 2012 election in Ohio.

The declaration of Fitrakis's other purported software expert, Mr. March, was not any more enlightening. Like Duniho's testimony, March's declaration did not establish a familiarity with the EXP software utility that demonstrates a factual basis to support Fitrakis's theory that the software can and will alter election results.

In short, the evidence presented did not substantiate Fitrakis's contention that there was any real harm that the EXP software would affect the tabulation of the official vote count. Having failed to demonstrate any burden on his right to vote, Fitrakis has not shown a likelihood of succeeding on an equal protection claim.

Nor is Fitrakis able to demonstrate a likelihood of success on a Due Process theory. As explained by the Sixth Circuit:

> The Due Process Clause protects against extraordinary voting restrictions that render the voting system "fundamentally unfair." *See*, *e.g.*, *Warf v. Bd. of Elections of Green Cnty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010) . . . . "[G]arden variety election irregularities" do not rise to that level, *Griffin v. Burns*, 570 F. 2d 1065, 1076 (1st Cir. 1978), but substantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they "result in significant disenfranchisement and vote dilution," *Warf*, 619 F.3d at 559 (citations omitted). So too do state actions that induce voters to miscast their votes. *Griffin*, 570 F.2d at 1074, 1078-79 (finding that Rhode Island's post-election invalidation of absentee ballots violated due process, because voters relied on state directives allowing such ballots); *Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 97 (N.D.N.Y. 2006).

*Ne. Ohio Coalition for the Homeless*, 2012 U.S. App. LEXIS 21058, at *44.

For the same reasons noted above, Fitrakis has not shown a Due Process violation warranting injunctive relief.  He has not demonstrated that the EXP software as utilized by the Secretary during Election Day is capable of altering election results, much less that some unidentified person with nefarious intent will or even may attempt to do so.  Fitrakis has nothing more than a speculative claim of a Due Process infirmity.

Fitrakis also alleges an Ohio taxpayer claim, asserting that the Secretary expended funds on the ES&S software unlawfully and has implemented the software without the testing required by Ohio law.  For his part, the Secretary argues that this Court lacks jurisdiction to consider this count of Fitrakis's Complaint and that, in any event, testing of the software was not necessary under Ohio law.[1]  Assuming *arguendo* that this Court has jurisdiction over this component of Fitrakis's lawsuit, Fitrakis has not shown how a statutory violation would impact his right to vote in such a way that would render injunctive relief proper.

### B. Irreparable Harm

To demonstrate irreparable harm warranting injunctive relief, Fitrakis must show " 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  As set forth above, Fitrakis has failed to demonstrate actual and imminent harm.  His claim to injunctive relief is based on a series of speculative assumptions about what the EXP software *might* do to the county vote tabulation computers and how someone *might* be able to use the EXP software to alter election results.  But

---

[1] The Secretary also submitted a declaration from Matthew M. Damschroder, the Deputy Assistant Secretary of State and Director of Elections for the Ohio Secretary of State's Office. (ECF No. 11-1.) Attached to Damschroder's affidavit is a letter from the U.S. Election Assistance Commission that describes the EXP software's function consistent with how ES&S has represented it to this Court.  In light of the EXP software's function, the U.S. Election Assistance Commission states in its letter that the EXP software is not considered part of the certified voting system and therefore does not require federal testing. (*Id.*)

9

Fitrakis has not provided actual *evidence* that demonstrates how this harm is a realistic possibility, much less how it is actual and imminent.  Having failed to show irreparable harm, Fitrakis cannot obtain the extraordinary injunctive relief he seeks.

### III.    Conclusion

Having found no likelihood of success on the merits or irreparable harm, the Court need not assess the remaining two factors.  The Court **DENIES**  Plaintiff's Motion for TRO.  (ECF No. 3.)

**IT IS SO ORDERED**.

        /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE